UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD ENRIQUE YBARRA,  )  <br>  )  <br>   Petitioner,  )  <br>  )  <br>   v.  )  <br>  )  <br>ANTHONY HEDGPETH, Warden,  )  <br>  )  <br>   Respondent.  )  <br>_____) | 1:10-CV-571 AWI DLB HC  <br>  <br>FINDING AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS  <br>  <br>OBJECTIONS DUE WITHIN THIRTY (30 DAYS) |

Ronald Enrique Ybarra (hereinafter "Petitioner") is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Fresno County Superior Court. A jury found Petitioner guilty of one count of willful, deliberate, and pre-mediated murder (Cal. Penal Code § 187(a)); and two counts of attempted murder (Cal. Penal Code § 664/187); and one count of street terrorism (Cal. Penal Code § 186.22(a)). The jury further found true the allegation that Petitioner personally used a firearm within the meaning of Cal. Penal Code § 12022.5(a)(1). On April 21, 2005, the Superior Court sentenced Petitioner to life without the possibility of parole plus an additional and consecutive ten years, and two additional life terms with the possibility of parole plus an additional and consecutive ten years on condition that Petitioner must serve a minimum of fifteen years prior to being eligible for parole.

Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District. On January 2, 2007, the Court of Appeal vacated a $10,000 parole revocation fine and

affirmed the judgment in all other aspects.

On January 25, 2007, the Court of Appeal ordered a rehearing in light of the United States Supreme Court decision in Cunningham v. California, 549 U.S. 270 (2007).  On April 18, 2007, the Court of Appeal vacated Petitioner's sentence *in toto* and remanded the matter to the trial court to hold contested sentencing hearings in compliance with Cunningham or, in the alternative, to impose mid-term sentences rather than aggravated sentences.  On May 9, 2007, the Court of Appeal issued an order modifying the published opinion without a change in judgment

On May 25, 2007, the Petitioner filed a petition for review in the California Supreme Court.  On May 29, 2007, Petitioner filed a petition for review in the California Supreme Court.  On August 15, 2007, the California Supreme Court granted both petitions for review and deferred further action in the matter pending the disposition of a related issue in People v. Gonzalez, S149898 and other matters.  On July 16, 2008, the California Supreme Court remanded the matter to the Court of Appeal for reconsideration in light of its decision in People v. Gonzalez, 43 Cal. 4th 1118 (2008).

On September 12, 2008, the Court of Appeal vacated Petitioner's sentence, remanded to the trial court for sentencing, but affirmed the judgment in all other respects.

On October 29, 2008, Petitioner filed a petition for review in the California Supreme Court.  On December 23, 2008, the California Supreme Court denied review without prejudice.

On April 2, 2010, Petitioner filed the instant federal petition for writ of habeas corpus. See Doc. No. 1.  On June 18, 2010, Respondent filed an answer to the petition.  See Doc. No. 12. On August 12, 2010, Petitioner filed a traverse.  See Doc. No. 16.

## FACTUAL BACKGROUND[1]

> On October 5, 2001, shortly after 7:00 p.m., someone in a BMW yelled out to [Petitioner], "What's up Sur?" [Petitioner] yelled back, "Bulldog." From inside the BMW, someone fired several shots at him from a handgun at point blank range but missed him. Sur is short for Sureños, a rival criminal street gang.

---

[1] These facts are derived from the California Court of Appeal's opinion on direct appeal issued on September 12, 2008.  See People v. Ybarra, 166 Cal. App. 4th 1069, 1074 (2008).  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts the presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004); Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009).

2

> Shortly after 9:30 that evening, [Petitioner], Cernas, and another male, all armed with guns, stepped out of a large car "between a gray and a blue" in color, walked toward a house that was "a perceived Sureño location" where Gilbert Medrano, his pregnant niece Mercedes López, and his friend Álvaro Romero were sitting outside talking, and opened fire. [Petitioner's] father owns a sky blue Lincoln Town Car.
>
> Bullets struck Medrano in the face, López in the leg and stomach, and Romero twice in the back and once in the hip. Medrano survived with a bullet lodged between his cervical vertebrae. López, who had a Caesarian section and a hysterectomy, and her daughter, who was born a month prematurely with a scratch mark from a bullet on her back, both survived. Romero died at the scene. A gang expert characterized both shootings as gang warfare between Bulldogs and Sureños.

See People v. Ybarra, 166 Cal. App. 4th 1069, 1074 (2008).

## I.  Jurisdiction

A person in custody pursuant to the judgment of a State court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  Petitioner's custody arose from a conviction in the Fresno County Superior Court.  As the judicial district encompasses Fresno County, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus.  See 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where the petitioner is currently in custody or the district court in which a State court convicted and sentenced Petitioner if the State "contains two or more Federal judicial districts").

## II.  Standard of Review

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently governed by its provisions.  See Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision

denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall, 603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

Title 28 of the United States Code, section 2254 remains the exclusive vehicle for Petitioner's habeas petition as Petitioner is in the custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006), overruled in part on other grounds, Hayward, 603 F.3d at 555. As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id. (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Id. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.

1  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making
2  the "unreasonable application" inquiry should ask whether the State court's application of clearly
3  established federal law was "objectively unreasonable." Id. at 409.
4       Petitioner bears the burden of establishing that the state court's decision is contrary to or
5  involved an unreasonable application of United States Supreme Court precedent.  Baylor v.
6  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the
7  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
8  state court decision is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir.
9  2003) ("While *only* the Supreme Court's precedents are binding on the Arizona court, and only
10 those precedents need be reasonably applied, we may look for guidance to circuit precedents");
11 Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA
12 amendments, it can no longer reverse a state court decision merely because that decision conflicts
13 with Ninth Circuit precedent on a federal Constitutional issue . . . This does not mean that Ninth
14 Circuit case law is never relevant to a habeas case after AEDPA.  Our cases may be persuasive
15 authority for purposes of determining whether a particular state court decision is an
16 'unreasonable application' of Supreme Court law, and also may help us determine what law is
17 'clearly established'").  Furthermore, the AEDPA requires that the Court give considerable
18 deference to state court decisions.  The state court's factual findings are presumed correct.  28
19 U.S.C. § 2254(e)(1).  A federal habeas court is bound by a state's interpretation of its own laws.
20 Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002).
21      The initial step in applying AEDPA's standards is to "identify the state court decision that
22 is appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where
23 more than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the
24 last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)) for the
25 presumption that later unexplained orders, upholding a judgment or rejecting the same claim,
26 rests upon the same ground as the prior order).  Thus, a federal habeas court looks through
27 ambiguous or unexplained state court decisions to the last reasoned decision to determine
28 whether that decision was contrary to or an unreasonable application of clearly established

5

federal law. Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir. 2003). As the California Supreme Court's decision consisted a summary denial, the Court looks through that decision to the last reasoned decision, namely, that of the California Court of Appeal's decision on direct appeal that was issued on September 12, 2008. See Nunnemaker, 501 U.S. at 804.

### III. Review of Petitioner's First Claim-Ineffective Assistance of Trial Counsel

Petitioner claims that his trial counsel was constitutionally ineffective for failing to object to "impermissibly suggestive" photographic lineups. Petitioner asserts that the second photo lineup was impermissibly suggestive in two ways. First, the police only updated Petitioner's photograph in the second photo lineup even though the second lineup contained the same six individuals as the first photo lineup. Petitioner contends that only updating his photo with a more current photograph would "telegraph" to Medrano that Petitioner was the perpetrator. See Petition at 10. Second, the police inserted black ink marks on the foreheads of all six individuals in the second lineup for purposes of covering up Petitioner's Bulldog gang tattoo on his forehead. Petitioner argues that because none of the six individuals in the first lineup had a black mark on their foreheads and because only Petitioner's photo was updated, this would suggest to Medrano that Petitioner's new updated photo contained a distinctive mark that needed to be concealed. Id.

For the reasons discussed below, the State Court's denial of Petitioner's ineffective assistance of counsel claim was not "objectively unreasonable."

### A. State Court's Decision

The California Court of Appeal on direct appeal rejected Petitioner's claim that his trial counsel provided ineffective assistance of counsel as follows:

> Hours after he was shot, Medrano looked at a six-pack photographic lineup that a detective showed him at the hospital. He had a tube down his throat, his face was "very swollen," and he could not speak, but he was coherent and responsive. Asked if he could identify anyone in the lineup as one of his assailants, he responded affirmatively by moving his head up and down, by writing "kinda" on a piece of paper, and by pointing to [Petitioner's] photograph in position 2.
>
> At the hospital two days later, the detective showed Medrano a lineup different in two respects from the one before. First, [Petitioner's] photograph, though in the same position as before, was newer than the one in the previous lineup. Second, the newer photograph used to show a Bulldogs gang tattoo on [Petitioner's] forehead, so the detective obliterated with dark ink that portion of his head and the identical portions of the other five heads. Medrano pointed to [Petitioner's] photograph in position 2 again and "said

> that this person looked like the person who was holding the shotgun."
>
> An appellate court will set aside "convictions based on eyewitness identification at trial following a pretrial identification by photograph" only if the pretrial procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." ( Simmons v. United States (1968) 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247.) The standard of independent review applies to a trial court's ruling that a pretrial identification procedure was not impermissibly suggestive. ( People v. Kennedy (2005) 36 Cal.4th 595, 608 609, 31 Cal.Rptr.3d 160, 115 P.3d 472.)
>
> The Attorney General characterizes the photographs in both lineups as showing "what appear to be young male Hispanics" who were "similar in appearance, age, and [the] physical characteristics" of "shaved heads, heavy builds, and some facial hair." We agree. Where photographs in a lineup are of males of the same ethnicity and of "generally of the same age, complexion, and build, and generally resembling each other," and where the accused's "photograph did not stand out, and the identification procedure was sufficiently neutral," the lineup is not impermissibly suggestive. ( People v. Johnson (1992) 3 Cal.4th 1183, 1208, 1214, 1217, 14 Cal.Rptr.2d 702, 842 P.2d 1; see People v. Gordon (1990) 50 Cal.3d 1223, 1243, 270 Cal.Rptr. 451, 792 P.2d 251, disapproved on another ground by People v. Edwards (1991) 54 Cal.3d 787, 834 835, 1 Cal.Rptr.2d 696, 819 P.2d 436.) The record belies [Petitioner's] argument that showing Medrano a second lineup two days after the first lineup "with a different photograph of [Petitioner] but with all of the same decoys that he had already rejected" "telegraphed to [him] that [Petitioner] was the suspect they wanted him to positively identify." Since our independent review of the record persuades us that [Petitioner] fails to make the requisite showing on appeal that the photographic lineups were impermissibly suggestive (see People v. Kennedy, supra, 36 Cal.4th at p. 608, 31 Cal.Rptr.3d 160, 115 P.3d 472), [Petitioner's] attorney had no duty to object to the photographic lineups or to the in-court identification, so for want of a valid premise we reject his ineffective assistance of counsel argument (see People v. Anderson, supra, 25 Cal.4th at p. 587, 106 Cal.Rptr.2d 575, 22 P.3d 347; Civ.Code, § 3532).

See Ybarra, 166 Cal. App. 4th at 1081-82.

B.   Applicable Law

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Id. at 687 88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690; see Wiggins v. Smith, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. Strickland, 466 U.S. at 693 94. Prejudice is

1  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the
2  result of the proceeding would have been different." Id. at 694.  A reasonable probability is "a
3  probability sufficient to undermine confidence in the outcome."  Id; see also Williams v. Taylor,
4  529 U.S. 362, 391 92 (2000); Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  In
5  reviewing defense counsel's performance, courts "must be highly deferential" and make "every
6  effort . . . to eliminate the distorting effects of hindsight."  Strickland, 466 U.S. at 689.

7  In Harrington v. Richter,    U.S.    ,    , 131 S. Ct. 770, 784 85, 178
8  L.Ed.2d 624 (2011), the Supreme Court recently stressed that "[t]he pivotal question is whether
9  the state court's application of the Strickland standard was unreasonable," which "is different
10 from asking whether defense counsel's performance fell below Strickland's standard." "The
11 standards created by Strickland and § 2254(d) are both 'highly deferential' ... and when the two
12 apply in tandem, review is 'doubly' so." Id. at 788.  The Court must ask not "whether counsel's
13 actions were reasonable" but "whether there is any reasonable argument that counsel satisfied
14 Strickland's deferential standard." Id.  Therefore, this Court's task under § 2254(d) is not to
15 undertake its own Strickland analysis, but to determine whether the state court's Strickland
16 analysis was unreasonable.

17         C.      Analysis

18         Petitioner argues that his trial counsel was deficient because he did not object to
19 "impermissibly suggestive" photographic lineups at trial. See Petition at 2.  The California Court
20 of Appeal held that trial counsel had no duty to object to the photographic lineups because the
21 lineups were not "impermissibly suggestive."  See Ybarra, 166 Cal. App. 4th at 1081-82.
22 Therefore, counsel's decision to not challenge the lineups was not ineffective assistance of
23 counsel.  Id.  Based on a review of the record, the Court finds that the California Court of
24 Appeal's determination that the photo lineups were not impermissibly suggestive was not
25 "objectively unreasonable.'"
26         The United States Supreme Court has held that evidence derived from a pre-trial
27 identification procedure may be constitutionally inadmissible on due process grounds if the
28 challenged procedure was so "impermissibly suggestive as to give rise to a very substantial

likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). "It is the likelihood of misidentification which violates a defendant's right to due process . . ." Neil v. Biggers, 409 U.S. 188, 198 (1972). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." Id. Photographic identification procedures are suspect where: (1) only a single photograph is displayed to the witness; (2) the accused's photograph is somehow emphasized; or (3) a single individual is displayed more than once in a photographic array. Simmons, 390 U.S. at 383. The repeated showing of the picture of an individual, for example, reinforces the image of the photograph in the mind of the viewer. Id. An identification procedure is impermissibly suggestive where it "[i]n effect ... sa[ys] to the witness 'This is the man.' " Foster v. California, 394 U.S. 440, 443 (1969).

     Petitioner argues that the photo lineups were unduly suggestive because the police only updated Petitioner's photo with a more recent photograph in the second lineup. Petitioner's argument has no merit for several reasons. First, the Court is not aware of any Supreme Court case or federal authority that has held that only updating a defendant's photograph in a second photo lineup, which contains the same individuals as the first lineup, renders the second lineup impermissibly suggestive.

     Second, Petitioner has not demonstrated how the updating of his photograph in the second lineup placed a special focus upon him such that it amounted to a suggestion by police to Medrano that Petitioner was "the man." See Foster, 394 U.S. at 443. It is insufficient for Petitioner to merely conclude that updating his photo with a more current photograph would "telegraph" to Medrano that Petitioner was the suspect. This is not a situation where Petitioner was the sole recurring photograph in the second lineup. In those situations, the chance of misidentification is heightened and "the witness is thereafter apt to retain in his memory the image of the photograph rather than that of the person actually seen." Simmons, 390 U.S. at 383-84.

Here, the trial records show that both lineups depicted the same six individuals. See Ybarra, 166 Cal. App. 4th at 1081-82. Applying the rationale of Simmons, because the second photographic lineup included the exact same individuals as the first lineup, there is not a heightened chance that the second lineup would serve to reinforce the image of Petitioner in Medrano's mind. Moreover, the photo lineups did not emphasize Petitioner as the lineups included Petitioner and five other individuals that the California Court of Appeal described as what appeared to be "young male Hispanics, who were similar in appearance, age, and [the] physical characteristics' of 'shaved heads, heavy builds, and some facial hair.'" Id.

Petitioner also argues that the black ink marks that police added to his forehead and the five other individuals in the second photo lineup were unduly suggestive. This argument also has no merit. The police added black ink marks to all six individuals in the second lineup because Petitioner's newer photograph contained a Bulldogs gang tattoo on his forehead. The police obliterated the tattoo with dark ink on that portion of Petitioner's head and the identical portions of the other five heads. Petitioner argues that because none of the six individuals in the first photo lineup had a black mark on their foreheads and given that only Petitioner's photo was updated in the second lineup, this would suggest to Medrano that Petitioner's new updated photo contained a distinguishing mark that needed to be concealed.

A review of the record, however, indicates that Medrano did not identify Petitioner as the perpetrator because he had a tattoo or any distinguishing mark. In fact at trial, Medrano testified that he could not recall seeing any tattoos on Petitioner's face. See RT 2234. As such, the black markings on the six individuals' foreheads in the second lineup were irrelevant to Medrano's identification of Petitioner. Given that the marking were irrelevant to identification, the markings could not have made the identification procedure unduly suggestive.

Based on the record, the Court finds that it was not objectively unreasonable for the California Court of Appeal to conclude that the photo lineups were not impermissibly suggestive. It follows that trial counsel did not have a duty to object to the photographic lineups. Therefore, the Court of Appeal's determination that counsel was not deficient for failing to object was objectively reasonable.

Accordingly, Petitioner is not entitled to habeas corpus relief on this ground.[2]

**IV.    Review of Petitioner's Second Claim- Juror Misconduct**

Petitioner claims that his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial were violated because a member of the jury engaged in prejudicial juror misconduct. See Petition at 5-7. Specifically, Petitioner contends that when a holdout juror expressed a desire to be discharged, a majority juror, who had prior jury service, dissuaded her by telling her that if she continued to maintain a position of not guilty that the trial judge would just instruct her to continue deliberating. See Petition at 10-11. Petitioner contends that this admonishment forced the holdout juror in favor of acquittal to submit to the will of the majority. Id. There is no merit to this claim and the Court of Appeal's denial of Petitioner's jury misconduct claim was not "objectively unreasonable."

    A.    State Appellate Court Decision

> [Petitioner] argue[s] that one juror's dissuasion of another from asking the trial court for discharge as a holdout juror constituted prejudicial juror misconduct. The Attorney General argues the contrary.
>
> During the hiatus between the verdicts and the sentencing hearing, the trial court received an anonymous letter from a "concerned citizen" purporting to narrate charges of jury bias by someone whom the writer identified as a friend who was a juror at Cernas's and Petitioner's trial. At the trial court's invitation, the juror appeared for in camera questioning by the trial court with counsel present. She said that after initial balloting showed nine votes for conviction and three votes (including hers) for acquittal a majority juror said the minority jurors were playing "the devil's advocate," which to her "was like the devil's helper," and that no one changed anyone's mind. She characterized the deliberations as "intense" and the majority jurors and herself alike as "mad." She described the tone of the majority jurors as " 'Hurry up and just say yes' " and the response of the minority jurors as acquiescence "little by little" in the will of the majority jurors. She said she "wanted to get out of it" but said nothing after a juror who had been a juror before told her "it would not be easy to get out of it" and the judge "would send [her] back and start deliberating more." At the end of the in camera questioning, Cernas and Petitioner made a motion for a new trial on the ground of juror misconduct. Finding no prejudice, the trial court denied the motion.
>
> "Jurors may be expected to disagree during deliberations, even at times in heated fashion." ( People v. Orchard (1971) 17 Cal.App.3d 568, 574, 95 Cal.Rptr. 66 ( Orchard ).) Quoting Orchard with approval, the Supreme Court called "particularly harsh and inappropriate" a majority jurors alleged death threat to a lone holdout juror but emphasized "no reasonable juror could have taken it literally. Manifestly, the alleged

---

[2] Because the Court does not regard the lineups as unnecessarily suggestive, the Court need not consider the reliability of the identification in determining whether the procedures gave rise to a substantial likelihood of mistaken identification. Neil v. Biggers, 409 U.S. 188, 198 99 (1972).

> 'death threat' was but an expression of frustration, temper, and strong conviction against the contrary views of another panelist." ( People v. Keenan (1988) 46 Cal.3d 478, 541, 250 Cal.Rptr. 550, 758 P.2d 1081 ( Keenan ).) Here, the record shows that at the polling of the jury the juror at issue answered, "Yes," to the question whether those were her verdicts as read. Likewise, at the polling of the jury in Keenan the lone holdout juror signified that the verdict "was her individual verdict." ( Id. at p. 542, 250 Cal.Rptr. 550, 758 P.2d 1081.)
>
> Petitioner argues, primarily in reliance on In re Stankewitz (1985) 40 Cal.3d 391, 220 Cal.Rptr. 382, 708 P.2d 1260 ( Stankewitz ), that the juror who had been a juror before "was not an expert of judicial practices" and that he "committed misconduct by asserting such expertise." The juror in Stankewitz "advised the other jurors that he had been a police officer for over 20 years; that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it; and that as soon as petitioner took the wallets at gunpoint in this case he committed robbery, whether or not he intended to keep them." ( Id. at p. 396, 220 Cal.Rptr. 382, 708 P.2d 1260.) That juror " 'consulted' his own outside experience as a police officer on a question of law," gave "legal advice" that was "totally wrong," and, "vouching for its correctness on the strength of his long service as a police officer," did not "keep his erroneous advice to himself" but "stated it again and again to his fellow jurors." ( Id. at pp. 399 400, 220 Cal.Rptr. 382, 708 P.2d 1260.) The Supreme Court found prejudice. ( Ibid.)
>
> Stankewitz is inapposite. The record here shows that the juror who had been a juror before professed no expertise in judicial practices but simply expressed an opinion on the basis of a life experience he had had. "The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the trial court. Such a weakness, however, must be tolerated." ( People v. Marshall (1990) 50 Cal.3d 907, 950, 269 Cal.Rptr. 269, 790 P.2d 676.)
>
> The governing standard on appeal is independent review, as a mixed question of law and fact, of the trial court's finding. ( People v. Nesler (1997) 16 Cal.4th 561, 582, fn. 5, 66 Cal.Rptr.2d 454, 941 P.2d 87 (plur. opn. of George, C.J.).) On the basis of admissible evidence in the juror's responses to the trial court's questioning (see Evid.Code, § 1150, subd. (a)), and applying the governing standard of review, we conclude that the trial court's finding of no prejudice is correct on the law and the facts alike.

See Ybarra, 166 Cal. App. 4th at 1087-88.

### B.     Applicable Law

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors." Irwin v. Dowd, 366 U.S. 717, 722 (1961). "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir.1997). The Sixth Amendment also requires the verdict to be based only on the evidence

produced at trial. Turner v. Louisiana, 379 U.S. 466, 472-473 (1965) ("[T]rial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel"). Juror misconduct may occur when a member of the jury introduces into its deliberations extrinsic facts which were not admitted in evidence or provided in the instructions. Thompson v. Borg, 74 F.3d 1571, 1574 (9th Cir.1996). A petitioner, however, is only entitled to habeas corpus relief if it can be established that the misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also Thompson,74 F.3d at 1574-76.

    C.    Analysis[3]

Petitioner contends that prejudicial juror misconduct occurred when a juror informed another juror that if she sought a discharge, the judge would send her back to deliberate. The California Court of Appeal rejected Petitioner's claim and found that there was no prejudicial jury misconduct. The Court of Appeal's decision was not "objectively unreasonable" for at least two reasons.

First, the mere fact that a juror expresses his opinion to another juror does not amount to a violation of a petitioner's Sixth Amendment's right to an impartial jury. In conducting their deliberations, "[j]urors have a duty to consider only the evidence which is presented to them in open court." Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir.1986). "[A] juror may not bring into the jury room evidence developed outside the witness stand such as the results of a juror's experiment conducted while the jury was on a weekend recess, or legal research performed

---

[3] The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 8 (2002). Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003). Because the reasoned opinion provided by the California Court of Appeal did not address Petitioner's federal constitutional issue at issue here, this Court, therefore, conducts an independent review.

during the trial in an attempt to supplement inadequate instructions from the judge." Grotemeyer v. Hickman, 393 F.3d 871, 878 (9th Cir. 2004).  However, when a juror exposes other jurors to information derived from a juror's common knowledge or personal experience, the Ninth Circuit has found that consideration of such evidence may be an appropriate part of the jury's deliberations.  United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir.1991); see also Grotemeyer, 393 F.3d at 878-79 (stating that a juror who shared her own experience as a physician with the jury did not rise to the level of a constitutional violation involving extrinsic evidence); United States v. Bagnariol, 665 F.2d 877, 888 (9th Cir.1981) (per curiam) (1982)) (discounting claim of prejudice where extraneous information was something "any reasonable juror already knew").  It is expected that jurors will bring their life experiences and general knowledge to bear on the facts of a case.  Hard v. Burlington N. R.R. Co., 870 F.2d 1454, 1462 (9th Cir.1989) (citing Head v. Hargrave, 105 U.S. 45, 49 (1881)).  Nevertheless, in some instances a juror's personal experiences may constitute impermissible extrinsic evidence.  This is the case when a juror has personal knowledge regarding the parties or the issues involved in the litigation that might affect the verdict.  See Hard, 812 F.2d at 486 (involving a juror who was allegedly a former employee of the defendant railroad, and who allegedly had personal knowledge of the railroad's settlement practices).

In the instant matter, the Court of Appeal found that the remarks made by one juror to another juror about the jury deliberation process did not amount to prejudicial jury misconduct because the juror was simply sharing his own opinion based on his personal life experiences.[4] See Ybarra, 166 Cal. App. 4th at 1087-88.  The Court agrees as the Ninth Circuit has found that consideration of such information may be an appropriate part of the jury's deliberations.  See Navarro-Garcia, 926 F.2d at 821; see also Grotemeyer, 393 F.3d at 878-79.  "[T]he general

---

[4] The trial court held an in camera hearing and questioned the minority juror with counsel present.  After the in camera hearing, the trial court concluded that there was no prejudicial juror misconduct. The Court of Appeal reviewed the record and found that the juror's remarks were his opinion and did not constitute impermissible extrinsic evidence.  See Ybarra, 166 Cal. App. 4th at 1087 88. Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state courts is presumed to be correct unless Petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004); Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009).

knowledge, opinions, feelings, and bias that every juror carries into the jury room " are properly considered during deliberations. See Hard, 870 F.2d at 1461. As the Court of Appeal noted, the juror was merely relaying his understanding of the jury deliberation process based on his prior jury experience, and was not claiming to be an expert in judicial practices. See Ybarra, 166 Cal. App. 4th at 1087-88. This is not a situation where a juror introduced extrinsic evidence, conducted his own research or performed out of court experiments. Grotemeyer, 393 F.3d at 878-79. Nor is this a situation where a juror had personal knowledge regarding the parties or the issues involved in the litigation that might affect the verdict. See Hard, 812 F.2d at 486.

Petitioner relies on Thompson v. Borg, 74 F.3d 1571, 1574-76 (9th Cir. 1996) in support of his argument that he suffered prejudicial juror misconduct. See Petition at 10. Thompson, however, is not helpful to Petitioner as it discusses cases where "extrinsic" evidence was introduced into the jury. See Thompson, 74 F.3d at 1574-76 (finding no prejudice where veniremen announced in front of potential jurors that he had read a newspaper article stating that defendant had withdrawn his initial guilty plea because the trial court took sufficient steps to cure error and the statement was ambiguous.)

Second, even assuming arguendo that the juror engaged in jury misconduct by sharing his opinion with a fellow jury member, there is no evidence that it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 627. There is no evidence that the majority juror's opinion regarding jury deliberations affected or altered the minority juror's vote regarding guilt. The record shows that at the polling of the jury the juror at issue signified that the verdict "was her individual verdict as read." See Ybarra, 166 Cal. App. 4th at 1087-88. Therefore, the Court of Appeal's decision was not "objectively unreasonable."

Accordingly, Petitioner is not entitled to habeas corpus relief on this ground.

V.     **Certificate of Appealability**

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides that a circuit judge or

15

judge may issue a certificate of appealability where "the applicant has made a substantial showing of the denial of a constitutional right." Where the court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 326; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338. In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable; thus Petitioner's claim is not deserving of encouragement to proceed further. Consequently, the Court hereby recommends that Petitioner be DENIED a certificate of appealability.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that:

1. The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and
2. The Clerk of the Court be DIRECTED to enter Judgment for Respondent; and
3. A Certificate of Appealability be DENIED.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections

///
///
///
///

shall be served and filed within fourteen (14) court days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **June 1, 2011**                        /s/ **Dennis L. Beck**
                                                                                   UNITED STATES MAGISTRATE JUDGE